

FILED

03/23/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2016

## STATE OF TENNESSEE v. CLYDE HOBBS

**Appeal from the Circuit Court for Grundy County**
**Nos. 4864 & 4865          Justin C. Angel, Judge**

_____

### No. M2016-00924-CCA-R3-CD

_____

The Defendant, Clyde Hobbs, appeals as of right from the Grundy County Circuit Court's revocation of his probation and order of confinement for eight years. The Defendant contends that the trial court abused its discretion when it determined that the Defendant had violated specialized conditions of his probation. Additionally, the Defendant argues that the trial court abused its discretion in fully revoking the Defendant's probation without considering possible alternatives. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

B. Jeffery Harmon, District Public Defender; and Robert G. Morgan, Assistant Public Defender, for the Defendant, Clyde Hobbs.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; J. Michael Taylor, District Attorney General; David L. Shinn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

FACTUAL BACKGROUND

On January 9, 2013, the Defendant pled guilty to one count of sexual battery by an authority figure in case number 4864, and one count of attempted sexual exploitation of a minor in case number 4865. See Tenn. Code Ann. §§ 39-13-527; -17-1003. The Defendant received a six-year suspended sentence for case number 4864 and a

consecutive two-year suspended sentence for case number 4865, resulting in a total effective sentence of eight years of probation. Additionally, the trial court ordered the Defendant to comply with the requirements of the sex offender registry and complete standardized sex offender treatment. He was ordered to have no contact with the victim, who was one of his nieces.[1] On January 15, 2016, the Defendant's probation officer issued a probation violation warrant to revoke the Defendant's probation, alleging that the Defendant violated the special conditions of probation for sexual offenders. Specifically, the probation officer alleged that the Defendant violated by accessing the Internet via a ROKU device, using a cell phone to view images of animal genitalia for sexual gratification, and having unsupervised contact with minors on multiple occasions.

At the April 1, 2016 revocation hearing, Andrew Thorton, the Defendant's probation officer, discussed the following facts, which gave rise to the issuance of the warrant. Mr. Thorton explained that he worked "in the program supervision unit, which [was] . . . a specialized unit within field services that supervise[d] anyone required to register on the Tennessee Sexual Offender Registry[.]" Because the Defendant was convicted of a sexual offense, Mr. Thorton was assigned to supervise him, but he explained that prior to being assigned to supervise the Defendant, Matthew Painter was the Defendant's probation officer and that Mr. Painter discussed the rules on the probation order with the Defendant. Mr. Thorton explained that for individuals convicted of a sexual offense, there was a "list of specialized conditions that [were] imposed[.]" Mr. Thorton identified a document, which included these specialized probation conditions for sex offenders. The document was signed by the Defendant, and the initials "CAH" appeared next to each special condition. Mr. Thornton testified that he believed these initials to be those of the Defendant and claimed that it was "common practice . . . to have the offender sign and initial each rule." Mr. Thorton stated that there were twelve specialized conditions, and the first paragraph of the document contained "a preamble . . . [to] explain what this document [was.]" Mr. Thorton read the following portion of the preamble:

> The conditions of probation that you signed . . . states in part that you will obey all laws and that you will carry out all lawful instructions given by your probation/parole officer. The following guidelines have been established for all offenders convicted of a sex offense as defined under Tennessee State Law. By your signature you acknowledge that your officer has gone over the following instructions with you.

---

[1] The record indicates that the Defendant has several nieces. The underlying facts regarding his probation revocation reveal that he had contact with several of these nieces; however, he did not appear to have contact the victim.

Mr. Thorton testified that he had discussed these rules with the Defendant and acknowledged that there had "been issues with [the Defendant] and hi[s] being compliant with those rules." Specifically, Mr. Thorton alleged that the Defendant violated "Rule Two . . . and Rule Nine of the specialized conditions." Rule Two stated,

> I will not obtain Internet access on my computer unless my officer has given me written permission for Internet access. I will not utilize an electronic device for any sexually oriented purpose. I further consent to the search of any electronic device, software, or electronic data storage device at any time by my officer.

Mr. Thorton said that the Defendant committed "two actions that violate[d] that rule." First, he alleged that the Defendant accessed the Internet through a "ROKU device in his bedroom." He explained that "[t]he ROKU device [was] a device that can access the Internet" and that the Defendant "was using that device to access online movies." Mr. Thorton confirmed that he saw the ROKU device and that "it was hooked up to a live Internet connection." On cross-examination, he stated that the ROKU device was "attached by cables to the TV" and that "one of the sisters said that they had bought it for" the Defendant and "installed it."

Second, Mr. Thorton asserted that the Defendant violated Rule Two by "utilizing an electronic device for a sexually oriented purpose." He explained that "on several occasions leading up to this alleged violation, [the Defendant] was found to be in possession of a cell phone that had multiple images of . . . animal genitalia." Mr. Thorton stated that he had warned the Defendant on previous occasions about "deviant sexual fixations[,]" and he instructed the Defendant "to delete the images and to no longer have any images" on his cell phone. On December 18, 2015, Mr. Thorton again found the Defendant in possession of a cell phone that contained "several hundred images . . . depicting animal genitalia." He elaborated, "The photos were . . . of multiple types of animals, horses, dogs, . . . , monkeys, focusing either on the vaginal area or []an erect penis." The Defendant gave his phone to Mr. Thorton voluntarily so that the images "could be further investigated." The phone with these images was found in a drawer in the Defendant's bedroom, and the Defendant admitted to Mr. Thorton that "he was using the images to attempt to masturbate." Mr. Thorton asserted that this was "a violation of a prohibition . . . against using an electronic device for a sexually oriented purpose."

Also, Mr. Thorton alleged that the Defendant violated Rule Nine of the special conditions of his probation. Rule Nine stated,

> If convicted of an offense against a minor, I will not date, befriend, reside or unite with anyone who has children under the age of 18, except my own

-3-

children unless further restricted by applicable law or court order. I will report all incidental contact with children to my treatment provider and my officer. I will not enter into contact with any child under 18 or anyone who is unable to give consent due to mental, physical, or emotional limitations unless an adult is present whom my officer and my treatment provider have approved in advance, in writing, as a chaperone.

The Defendant was not permitted to be around anyone under the age of eighteen unless he was supervised by a "chaperone approved through [the Defendant's] treatment provider." The Defendant received sex offender treatment in Chattanooga, and Mr. Thorton stated that the Defendant "had chaperones approved by that treatment provider that allowed him to have some contact with minors." Mr. Thorton maintained that the Defendant violated Rule Nine by having inappropriate contact with minors on three separate occasions.

First, the Defendant made plans "to pick up his niece to help her run some errands." However, when he arrived to pick her up, "a friend of the niece got in the vehicle with him with what he described as an infant." Neither the niece nor her friend was an approved chaperone.

Second, Mr. Thorton alleged that "on several occasions while at [a] senior citizens center, [the Defendant] had contact with minors." Specifically, the Defendant had spoken with the minor grandchild of the director of the senior center. Furthermore, Mr. Thorton did not believe there were any approved chaperones present at the time. He explained, "Any use of [a] chaperone [was] required to be pre-approved by [him]. [The Defendant] ha[d] to give [Mr. Thorton] a date and a time of when the chaperone [was] to be used."

Third, Mr. Thorton testified that the Defendant admitted to him that he was alone with his two nieces during a supervised visit, during which his sister was supposed to be his chaperone. Mr. Thorton claimed that the Defendant told him that on July 4, 2015, during a pre-approved event, the Defendant "was outside with his two nieces and that he was outside alone and that he was running around the house with them, playing with those two minor nieces. He sa[id] that he believe[d] that during that interaction he was unsupervised . . . with those two minor nieces."

On cross- examination, Mr. Thorton acknowledged that the Defendant appeared to have a diminished "mental capacity." He elaborated, "[T]here is some difficulty there. . . . [H]is mental capacity is lower than . . . I guess a normal functioning [individual]." Mr. Thorton was not aware if the Defendant had been diagnosed "with any mental illness or mental disabilities[,]" but he stated, "[The Defendant] does have some health issues."

Additionally, Mr. Thorton agreed that the term "contact" was not defined on the Defendant's probation order or the list of special conditions. He explained that "contact . . . would mean either sustained or . . . substantive [contact], not passing someone in the grocery store." Mr. Thorton conceded that he had not discussed the definition of contact with the Defendant because he assumed "that it would have been gone over in his initial intake[,]" which was performed by the Defendant's first probation officer. Mr. Thorton agreed that according to probation regulations, he was required to "address incidental contact" with the Defendant. Mr. Thorton explained that incidental contact "would be something of substance . . . that was not initiated by the offender. That would be something that was outside of [the Defendant's] control that he couldn't help and that the incidental contact [was] one that [was] required to be immediately reported to [Mr. Thorton.]" He stated that incidental contact was something "other than passing contact." When asked if the Defendant had a question about what "contact, incidental contact or anything was" at the time he sought permission to have a supervised visit with his nieces, Mr. Thorton responded, "No."

The State informed the trial court that at the time the Defendant entered a guilty plea, the Defendant received a forensic evaluation to determine his competency to enter a knowing and voluntary plea. After being evaluated by a psychiatrist, the Defendant was found to be competent.

The Defendant's sister, Sharon Hobbs, explained that the Defendant did have access to a ROKU device in his bedroom. She stated that a remote was needed to turn on the ROKU device, and the device permitted him to "watch movies." She agreed that the ROKU device "worked off the Internet[,]" but she claimed that she "didn't think about it" violating terms of the Defendant's probation.

Ms. Hobbs testified that she resided with the Defendant, her sister, and another brother. She recalled the family gathering at which the Defendant was present with his two nieces and stated that she was an approved chaperone for him. When asked if the Defendant was ever outside the home with the children, she explained,

> [T]he kids wanted him to go out with [them]. They went out the back door first and . . . I got up to the window and [the Defendant] went out. He was going around the house when I got up to the window, and I watched [them] all there. He was standing . . . around while they [were] playing and stuff. In about maybe [ten] minutes, my sister, [the children's] grandmother, hollered and told [them] to [c]ome in.

When asked if there was any time period in which she did not observe the Defendant with the children, she replied, "No[.]" Ms. Hobbs also agreed that she was no longer an approved chaperone for the Defendant.

Ms. Hobbs testified that she took medications that might impair her memory. She explained that these medications were related to her mental health, and the following colloquy occurred on cross-examination:

> Q. Might your memory also impact your ability to remember what happened last July 4th at your house, whether you actually watched your brother with those children?
>
> A. Well, I always remember the visits.
>
> Q. Oh, you always remember that[?]
>
> A. I always watch the kids when they're there.
>
> Q. Well, what kind of things do you forget?
>
> A. Everything just about.

The Defendant testified in his own defense. He said that he lived with two of his sisters and his brother. Due to his "mental disabilities[,]" he was unable to work. He explained that he visited a "mental health center" to receive mental health treatment. He testified that he also had extensive medical problems and took multiple daily medications.

When asked about his understanding "of contact with children[,]" the Defendant responded, "I don't really know what kind of contact you're talking about . . . [I] wasn't supposed to hug [them] or nothing [sic]." The Defendant stated that he informed his probation officer "ahead of time . . . about the [family] get togethers [sic]." However, he stated that he knew he was not supposed to be around children without first obtaining permission from Mr. Thorton. The Defendant asserted that he "didn't have physical contact" with any children at the senior citizens center. However, he also agreed that he had interacted with children "a time or two" while there and that they "play[ed] Bingo together[.]" The Defendant stated that he "didn't say nothing out of the way[,]" and he claimed that there was "somebody there [with the children] all the time."

When asked about the July 4, 2015 family gathering, the Defendant offered the following explanation:

[The children] wanted me to go outside with [them] for a little while to play and I did. I didn't run [them] around the house or nothing [sic]. I just played with [them] for a little bit, . . . and then their grandmother called [them] in because they [were] going to get in the building out there, and they went around one side of the house, and I went around . . . [to] the other side of the house.

On cross-examination, the Defendant acknowledged that he was "not supposed to be alone with children[,]" but asserted he "wasn't alone" with the children. He explained that his "sister[] was looking out the window . . . the whole time [he] was out there." However, he agreed that he was not "watching [his] sister the whole time[,]" and he did not know whether she was actually watching him or not. Additionally, he asserted that he "didn't hug [his nieces]" but said, "they c[a]me to [him] and hugged [him]."

Regarding the ROKU device in his bedroom, the Defendant explained that the device had been installed shortly before his arrest and asserted that he had never used the ROKU device in his bedroom. He stated that "the only one [he] used [was] . . . in the living room." He did not request to have one installed in his bedroom nor did he request one be installed in the living room. He further maintained that he "didn't realize that it was the Internet."

The Defendant acknowledged that he had a cell phone with "obscene pictures on it." He hid the phone, which contained pictures of animal genitalia, in his bedroom so that his siblings would not find it. He agreed that there were images of "female animals with their vaginas spread open" and images of "animals with erect penises." Mr. Thornton had warned the Defendant "that he didn't think it was against the law or nothing [sic] to have [the pictures], but said that it could cause [the Defendant] to re-offend." The Defendant kept the images and used them "to see if it would help [him] to get aroused."

Following the hearing, the trial court found that the Defendant had violated Rule Two of his special conditions of probation by accessing the Internet through a ROKU device and possessing pictures of animal genitalia on a cell phone for the purposes of sexual gratification. Additionally, the court found that the Defendant violated Rule Nine by having unsupervised contact with minors on three separate occasions. The court noted that the Defendant had previously been adjudicated competent for the purposes of his guilty plea. The court ordered the Defendant to serve the balance of his eight-year sentence in confinement. He filed a timely notice of appeal.

ANALYSIS

The Defendant contends that the trial court abused its discretion when it determined that he violated the special conditions of his probation by accessing the Internet through a ROKU device. The Defendant asserts that he "did not obtain Internet access on a computer, as stated in the rule[,]" but rather "the proof showed that the Defendant and his family had a ROKU device connected to their television." Additionally, he argues that the trial court abused its discretion by finding that he had violated the special conditions of probation by having improper contact with minors. The Defendant contends that the proof at the hearing indicated that the Defendant did not understand "the meaning of incidental contact," and that the rules and conditions of the Defendant's probation "failed to define what type of contact was prohibited." Finally, while the Defendant admitted to "using an electronic device to view images of animal genitalia in an attempt to become sexually aroused," he argues that the trial court abused its discretion by failing to consider possible alternatives. The State responds that the trial court properly exercised its discretion in revoking the Defendant's probation and ordering him to serve the balance of his sentence in confinement.

A trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release. Tenn. Code Ann. § 40-35-311(e). Upon finding by a preponderance of the evidence that a defendant has violated the conditions of his release, the trial court "shall have the right . . . to revoke the probation and suspension of sentence" and either "commence the execution of the judgment as originally entered" or "[r]esentence the defendant for the remainder of the unexpired term to any community-based alternative to incarceration." Tenn. Code Ann. § 40-35-311(e). In a probation revocation hearing, the credibility of the witnesses is determined by the trial court. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991).

Furthermore, the decision to revoke probation is in the sound discretion of the trial judge. State v. Kendrick, 178 S.W.3d 734, 738 (Tenn. Crim. App. 2005); Mitchell, 810 S.W.2d at 735. The judgment of the trial court to revoke probation will be upheld on appeal unless there has been an abuse of discretion. State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). To find an abuse of discretion in a probation revocation case, "it must be established that the record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." Id. (citing State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980)); see also State v. Farrar, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011). Such a finding "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

In rendering its decision to revoke the Defendant's probation and ordering a period of incarceration, the trial court reasoned as follows:

> I believe the State has proven that [the Defendant] violated Rule Number Two of the special provisions . . . not having any device that connects to the Internet, Internet connections. He violated that rule twice. He had a cell phone that was able to connect to the Internet and download images and he had a ROKU device. ROKU device connects to the Internet. I have two ROKU devices. When you set [them] up it asks for your Internet and says connect to . . . your Internet and so you know it connects to the Internet, it says it right on the screen. Then you select . . . what Internet router you want to connect to, and then it asks for a password, asks for an e-mail. And what it does it e-mails you a password and you've got to get on another Internet source and access your e-mail, access that code, then go back to your screen, your ROKU screen, and type in that code. So it is -- there is no way anyone could ever possible know that a ROKU device does not connect to the Internet because it says so as you connect it, that's the only way it works. So, yes, that is an Internet device, and that device can be used to do searches. It has [YouTube] and other applications on it that you can essentially surf the Internet, access everything you want to on the Internet through a ROKU device.
>
> And the court notes that the cell phone violation not only did he possess a[n] Internet device, but he possessed an Internet device that had hundreds of images of animal genitalia . . . and he admitted that he had those pictures for the purposes of sexual gratification or arousal. So that definitely violated his probation there.
>
> Rule Number Nine, I feel the Defendant also violated that . . . by having contact. This first with the niece and the niece's friend and the friend had an infant in the vehicle . . . . [T]here was a[n] infant with them and that was an unsupervised -- in a vehicle, and . . . that's not an incidental thing, and that's not driving down the road and somebody jumps in the window of your vehicle and all of a sudden you have an incidental contact with [them]. I'm sure he had to stop the vehicle and open the door and they got inside the vehicle or whatever this case was. He was inside the vehicle with a minor that he did not have permission to be around.

Regarding the Defendant's contact with minors at the senior citizens center, the trial court stated,

That was not an incidental contact that was contact he even admitted to speaking with them. He said he didn't touch them, but he was close enough to speak to them and play Bingo, which usually takes . . . a few minutes and he had contact with people he wasn't supposed to have contact with. He could have got up and walked out of the building at any time, that's what he should have done[.]

The trial court continued:

[A]lso I believe he violated Rule Number Nine by having unsupervised substantial non-incidental contact with his nieces, two minor nieces, I believe at the home. There was no one outside in the yard. Supposedly there was someone inside the house looking out a window, that's not supervising. There's -- he also admitted to . . . hugging on them and having physical contact with them. And one might say, well, those are his nieces, no big deal. Well, he got convicted of a sexual crime against a niece so that's why I think that is a big deal.

In short, the trial court concluded that the Defendant violated the terms of his probation by using a cell phone to download images from the Internet for sexual gratification, connection to the Internet via a ROKU device,[2] and having unsupervised contact with minors on multiple occasions. The trial court found that the Defendant's sister was not a suitable chaperone for the Defendant. Regarding the Defendant's mental capacity, the court stated,

He's been adjudicated competent by certified medical professionals. There is no issue of capacity that was brought up for the underlying offense here, and then also today there's no issue -- he took the stand, I explained his rights to him and he knowingly and voluntarily, intelligently waived his right. So I do take note that he may have a lower IQ or sub-par performance or sub-capacity, . . . but . . . I can't use that as an excuse to just ignore his behavior.

The trial court was within its discretion to determine that the Defendant violated the conditions of his probation by a preponderance of the evidence. This court has repeatedly held that "an accused, already on probation, is not entitled to a second grant of

---

[2] We note that a ROKU is a media streaming device that connects to the Internet. Users download various applications from the ROKU website to access movies, television shows, and music. The ROKU Web application allows users to browse any website or url on the Internet using a ROKU device. ROKU, http://www.roku.com (last visited Nov. 21, 2016).

probation or another form of alternative sentencing." State v. Jeffrey A. Warfield, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999); see also State v. Timothy A. Johnson, No. M2001-01362-CCA-R3-CD, 2002 WL 242351, at *2 (Tenn. Crim. App. Feb. 11, 2002). It was within the trial court's authority to order the Defendant to serve his previously imposed eight-year sentence in confinement upon revoking the Defendant's probation. See Tenn. Code Ann. §§ 40-35-310,-311(e); Mitchell, 810 S.W.2d at 735. The Defendant is not entitled to relief.

<u>CONCLUSION</u>

Based upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE